UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **LUIS R. TREVINO** | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | |
| **B. D. HOLT COMPANY** | § § | Civil Action No. 5:20-cv-00849 _____ |
| | § § | |
| *Defendant.* | § § | |
| | § § | **JURY TRIAL DEMANDED** |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT.

Plaintiff, Luis R. Trevino ("Trevino" or "Plaintiff"), by counsel, brings this action against Defendant, B. D. Holt Company ("Holt" or "Defendant"). For causes of action Plaintiff respectfully shows the Court as follows:

**I.**

**INTRODUCTION**

1.01    Plaintiff would show the Court that Defendant wrongfully fired him from his job in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq ("FMLA"), when Plaintiff was going to take time off for a knee operation.

## II.

## THE PARTIES

2.01    Plaintiff Trevino is a citizen of Texas who can be contacted in care of his undersigned counsel of record.

2.02    Defendant B. D. Holt Company is a foreign for-profit corporation with its principal address at 5665 SE Loop 410, San Antonio, Texas, 78222. Defendant can be served through its registered agent for service of process in the State of Texas, Michael Puryear, 5665 SE Loop 410, San Antonio, Texas, 78222.

## III.

## JURISDICTION AND VENUE

3.01    Pursuant to 28 U.S.C. §1331, jurisdiction is appropriate in the United States District Court for the Western District of Texas as this action involves a question of the application of federal law, namely the Family and Medical Leave Act of 1993 (the "FMLA"), 29 U.S.C. §2601, et seq.

3.02    Venue for all causes of action stated herein lies in the Western District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. §1391.

## IV.

## FACTUAL ALLEGATIONS

4.01    Plaintiff was hired on at B. D. Holt Company on October 20, 2015 as a Welder/Machinist for the night shift at $20.00 an hour. After about a month, he was moved to the Day Shift and was given $18.00 an hour, same job. As the years went by, he received good reviews

for his performance with a compensation of $23.35 per hour and annually $44,832.00.

    4.02    During Plaintiff's time working for Defendant, he began to have problems with his left knee. Plaintiff realized he was going to need time off to have surgery on his knee. In the meantime, he had regular knee shots to keep the pain under control.

    4.03    In 2019 Plaintiff received a very good review and was able to receive a bonus for his Performance. Plaintiff was never written up for any attitude or safety issues.

    4.04    As the year 2020 began, January and February to be specific, Plaintiff had been assigned to work in a different building due to the need for a welder/machinist to work certain job assignments that only he could perform.

    4.05    In March, for most of the month, Plaintiff continued to work in the new building as needed. Plaintiff continued to have knee pain but continued his job assignments. His immediate Supervisor, Terry Gisealhart, was aware of Plaintiff having problems with his left knee, Plaintiff had been under a doctor's care for it, and that more intrusive medical care was required.

    4.06    On or about April 2, 2020 Plaintiff called in to work late, at about 9:00 a.m. instead of 7:00 a.m., due to having excruciating and disabling knee pain. He was advised by Terry his supervisor, that this was going to be an Unexcused Absence because he had called in later than start time.

    4.07    On or about April 3, 2020 Plaintiff went ahead and went to work, clocked in on time, and realized he would not be able to work due to his knee getting worse to the point of disabling him. Plaintiff advised his boss he was leaving for the day due to severe and disabling knee pain.

    4.08    During the beginning of the Pandemic, the employees were advised that because

they were considered essential employees, they would have to come to work as usual. The company came up with a schedule that would help the employees not work too closely together, which did not work.

4.09 So between April 6 thru 10, 2020, Plaintiff worked in the new shop/building following the schedule in that building.

4.10 Between April 13 thru 17, 2020, Plaintiff worked a different schedule, because the previous schedule was not compatible with the work needed.

4.11 During the time Plaintiff worked in the new building, he was not spoken to for any disciplinary reasons.

4.12 On Monday, April 20, 2020, Plaintiff clocked in, as usual, and began to work. After a while that morning, Plaintiff was approached by Safety Regulations Supervisor Jeff Painer, who advised Plaintiff he was terminated, to gather his tools and things and leave the premises. Plaintiff asked why he was being terminated and was advised it was due to his attitude and safety. As Plaintiff began to gather his tools and toolbox, he asked his immediate supervisor, Terry Giesalhart, if he had any paperwork regarding why he was being terminated. Terry stated he did not know why, and that Jeff Painer let him go, not him.

4.13 After Plaintiff returned his uniforms back to Defendant. Plaintiff approached his now ex-supervisor, Terry, to ask if he could write down the reasons why he was terminated. Terry looked stunned at Plaintiff because Plaintiff had come back and returned his uniforms so quickly. Terry then advised Plaintiff to hold on, went into his office and made a phone call. After a few minutes, Jeff Painer came back and told Plaintiff, if he had any questions, to go to the HR Office and speak to Stephanie. When Plaintiff went to the HR Office and asked for Stephanie, he was

advised she was in another building and not there in that office. Plaintiff tried several times to contact Stephanie, but she never returned his calls.

4.14 These are the dates Plaintiff received his knee shots: 2/28/2010, 3/06/2020, 3/13/2020, 3/20/2020 & 3/27/2020.

4.15. Prior to being fired Plaintiff was in the process of starting and filing paperwork with insurance and FMLA to cover his knee surgery that was scheduled for June 23, 2020. This knee surgery was going to be a complete knee replacement.

## V.

## FIRST COUNT

### FAMILY AND MEDICAL LEAVE ACT DISCRIMINATION, INTERFERENCE AND RETALIATION

5.01 The foregoing paragraphs in this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

5.02 Plaintiff had just started applying for FMLA leave when Defendant fired him.

5.03 Defendant was subject to the provisions of the FMLA. Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site for twenty (20) or more work weeks in the prior or current calendar year.

5.04 As a result of the interference, discrimination, retaliation and termination by Defendant, Plaintiff was denied FMLA leave and insurance benefits. As a result, Plaintiff has suffered significant financial loss, including backpay and front pay and the loss of benefits of his employment, including health insurance. Plaintiff is entitled to front pay and other equitable relief. Discrimination and retaliation were motivating factors in Plaintiff's termination.

5.05   The aforementioned acts were and are a willful violation of the FMLA and entitle Plaintiff to recover damages as provided by 29 U.S.C. § 2617, including liquidated damages. Plaintiff further seeks reinstatement to his position or a comparable position with reinstatement of benefits and seniority time, and with appropriate injunctive relief.

5.06   As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief.

## VI.

## SECOND COUNT

## RETALIATION FOR EXERCISING FMLA RIGHTS

6.01   The foregoing paragraphs in this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

6.02   Defendant's termination of the Plaintiff's employment was in direct response to Plaintiff attempts to exercise his rights under the FMLA, and in retaliation.

6.03   As a result of his termination, Plaintiff has suffered significant financial loss and the loss of salary and benefits of his employment, including health insurance for himself.

6.04   The aforementioned acts were and are willful violations of the FMLA and entitle Plaintiff to recover damages as provided by 29 U.S.C. §2617, including liquidated damages. Plaintiff further seeks reinstatement to his position or a comparable position with reinstatement of benefits and seniority time.

6.05   As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief.

## VII.

## **JURY TRIAL DEMANDED**

7.01    PLAINTIFF DEMANDS A TRIAL BY JURY.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover the following relief against Defendant:

1) Judgment against Defendant for actual damages, including lost wages and benefits (both back pay and front pay), and damage to past and future earnings capacity, the sum to be determined at time of trial;

2) Damages for mental and emotional distress, loss of enjoyment of life, and inconvenience Plaintiff has experienced and endured as a result of the discriminatory actions of Defendant;

3) Reinstatement;

4) The costs and expenses incurred by Plaintiff in seeking new employment;

5) Additional liquidated and/or punitive damages;

Dated:  July 21, 2020

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: *W. D. Masterson*
W.D. Masterson
State Bar No. 13184000
wdm@kilgorelaw.com
3109 Carlisle Street
Dallas, Texas 75204
Telephone:  214/969-9099
Telecopier: 214/953-0133
**ATTORNEYS FOR THE PLAINTIFF**
**LUIS R. TREVINO**